Joseph H. HAVENER, Warden of the North Dakota State Penitentiary, Petitioner,

v.

Gerald G. GLASER, Judge of the District Court, Burleigh County, Fourth Judicial District, Respondent.

Crim. No. 587.

Supreme Court of North Dakota.

March 11, 1977.

Edwin F. Zuern, Special Asst. Atty. Gen., Bismarck, for petitioner.

Houdek & Wolberg, Bismarck, for respondent; argued by Duane Houdek, Bismarck.

ERICKSTAD, Chief Justice.

We are asked by Joseph H. Havener, warden of the North Dakota State Penitentiary, to issue a supervisory writ staying a February 11, 1977, order of the North Da-kota district court, fourth judicial district, releasing prisoners Richard Collins and Michael Schroeder from administrative isolation. On February 11, we directed that the order of the district court be stayed until further order of this court, and that the Honorable Gerald G. Glaser, judge of the district court, show cause why the stay order should not be made permanent. A show cause hearing was held at 10:00 a. m. February 17, 1977, before this court.

This matter came to the district court as a petition for a writ of habeas corpus, brought by counsel for prisoners Collins and Schroeder, under Chapter 32–22, N.D.C.C.

Both prisoners were placed in administrative isolation (referred to by the parties as AI) on October 26, 1976, after allegedly being found in possession of marijuana within the confines of the penitentiary 11 days earlier. The AI unit exists pursuant to Section 505, North Dakota State Penitentiary Administrative Regulations (November 28, 1975, as amended February 27, 1976), which reads:

"Pursuant to authority from the Director of Institutions, and effective this date, an Administrative Isolation Unit is established at the North Dakota Penitentiary. This unit will occupy the First Tier, East in the new cell house, formerly designated as Maximum Security. This unit is *not* to be used as a place of confinement as a *punishment* for violation of institutional rules. It is intended for more secure housing and control of those few inmates who have not responded to counselling or conventional disciplinary sanctions, and who are flagrantly and chronically disruptive of good order or security. Placement in this unit and operation of the unit will be according to the following rules.

"1. The Warden or, in his absence, the Deputy Warden must approve placement of an inmate in this unit. This will normally be done only after recommendation from an Administrative Isolation Review Committee. However, the Warden or

Deputy Warden may approve an emergency placement, to be reviewed by the Review Committee within seventy-two (72) hours, if a week-end intervenes, or within twenty-four (24) hours during a regular work week.

"2. The Review Committee shall be chaired by either the Director of Programs or the Chief Assistant Deputy Warden. It shall consist of three (3) members, one of which must be a staff member of the Programs Department.

"3. Recommendations for placement in this unit may be made to the Review Committee by the Adjustment Board, or by one of the Assistant Deputy Wardens, who may have investigated recommendations from subordinate staff. Recommendations to the Review Committee must be in writing and must be detailed and specific as to reasons for the recommended placement.

"4. Criteria for placement in the unit are:

"a. The inmate has established a chronic inability to adjust to the general Penitentiary population; or

"b. The inmate constitutes a serious and continuing threat to the security of the institution, or to other inmates.

"5. An inmate being considered for placement in the unit shall have all of the same rights and procedural protections as is now afforded by the Adjustment Board.

"6. Inmates confined in Administrative Isolation shall be provided with the following:

"a. Regular institutional clothing;

"b. All regular cell furnishings and personal items, unless the inmate is destructive, suicidal, or pyromanic, in which cases only dangerous items will be removed;

"c. Regular mail and visiting privileges;

"d. Reading material on the same basis as the general population;

"e. All legal services available to the general population;

"f. Exercise periods outside the cell no less frequently than twice weekly for at least one hour each. No more than one prisoner will be allowed out of his cell for exercise at any one time and will shower or clean his cell during this same period;

"g. Medical attention as needed;

"h. A shower no less often than twice a week for a period not to exceed ten (10) minutes;

"i. Radio to the same extent as the general population;

"j. Visits by the Chaplain and other professional staff; and

"k. Food of the same kind and amount as the general population, served in the unit.

"7. Inmates leaving or entering the Administrative Isolation Unit must be thoroughly searched, and shall be escorted to and from their destinations.

"8. A folder record will be established for each inmate upon admission to the unit, and each staff member who talks to each inmate will record the nature of the contact and his impressions and recommendations.

"9. A log record for the unit will be kept by the Cell House Captains and dates and times of visits and inspections will be recorded, as well as any other pertinent information.

"10. The status of every inmate in Administrative Isolation must be reviewed by the Review Committee at least every thirty (30) days. Their recommendations for continuing in the unit, or for release to the general population, must be submitted to the Warden or Deputy Warden with the reasons clearly stated. The inmate shall have the

opportunity to personally appear before the committee.

"11. No inmate may remain in the unit for more than three months unless he is personally interviewed by the Warden or Deputy Warden, and the reasons for remaining clearly stated in writing. If an inmate is kept in the unit for as much as six (6) months, he must be personally interviewed by a staff member from the Office of the Director of Institutions, who will report his recommendations and reasons to the Director.

"12. Whenever an inmate is placed in this unit, the Warden shall notify the Director of Institutions in writing with the reasons.

"13. Rules violations by inmates of this unit shall be handled by the regular Adjustment Board with any disciplinary cell time served in the regular Disciplinary Unit."

In compliance with paragraph 10 of the above regulation, the status of both Schroeder and Collins was reviewed on November 26 and December 23, 1976, and on January 18, 1977. The decision was made following each review to retain the prisoners in AI. The reasons given for continuing Schroeder and Collins in AI ranged from a flat recommendation that each "continue in AI with periodic reviews" to a conclusion that the prisoner "is still considered a threat to the security of the institution." Schroeder and Collins maintain that this is not sufficient to provide due process; that the reasons for continuance and identification of criteria and standards employed in reaching the determination must be provided in writing. This position was essentially approved by the district court in issuing the writ.

The court, in its memorandum opinion, relies heavily upon *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). In that case, revocation of a State prisoner's good-time credit for satisfactory behavior while in prison, where the right to good-time credit was statutorily created by the State and it recognized that its depriva-

tion was a sanction for major misconduct, the Court found that the prisoner had a Fourteenth Amendment "liberty" interest entitling him to minimum due process procedural rights. Pertinent parts of the district court's memorandum opinion follow:

"The requirements prescribed by the Supreme Court in *Wolff* are as follows:

"1. Advance written notice of the charges.

"2. Written statement of fact finding as to the evidence relied on and the reasons for the action taken. If personal or institutional safety would be implicated by observing this requirement, such evidence may be excluded, but the statement should indicate the fact of omission.

"3. The prisoner may present evidence on his own behalf unless doing so would be unduly hazardous to institutional safety or correctional good.

"Cross-examination of witnesses, although permissible, is not required, nor is the presence of counsel.

"Even though the prisoner's interests in administrative isolation are not so substantial as would be the case in the loss of good time, there appears no reason why the requirements set forth above could not be observed in such cases except that, since prison security may be involved, there should be no requirement for *advance* notice. If, however, security needs dictate immediate administrative isolation, the prisoner should promptly thereafter be given a hearing on the matter.

"The procedures followed by the prison authorities fall short of these standards.

. . . . .

"The prisoners should be released from administrative isolation until such time as the standards herein described are followed, unless, as indicated, the threat to security is immediate, in which case the appropriate hearings should promptly follow. It does not appear that there would be any need for immediate confinement in view of the nature of the threat to security described by the Warden.

"The writ will issue accordingly."

■ In considering whether or not a supervisory writ should issue, we must determine if an adequate remedy by appeal or otherwise is available. This court, in *Green v. Wiese,* 78 N.W.2d 776 (N.D.1956), said:

" 'The power of superintending control will not be exercised upon light occasions or where there is adequate remedy by appeal or otherwise. In this state no appeal lies from a decision in a habeas corpus proceeding. *State ex rel. City of Bismarck v. District Ct.,* 64 N.D. 399, 253 N.W. 744. But the action of a district court in such proceeding may be reviewed and controlled through the exercise of the power of superintending control even though the trial court has entered a final order discharging the petitioner.' " *Id.* at 780.

■ Both parties before us have proceeded as though they do not dispute that our jurisdiction over this matter is in the nature of a general superintending control over an inferior court. That such is our role has been clear since this court decided *State ex rel. City of Bismarck v. District Court in and for Burleigh County,* 64 N.D. 399, 253 N.W. 744 (1934). It is true that Section 86 of the North Dakota Constitution, relied upon in that case as conferring such power of superintending control, was amended in the primary election of September 7, 1976. This court has recognized, however, that the amendment to Section 86 has not affected this power. *See Kuhn v. Beede,* 249 N.W.2d 230 (N.D.1976); *State ex rel. Olson v. Thompson,* 248 N.W.2d 347 (N.D.1976).

As to our scope of review, we held in *State ex rel. City of Bismarck* that:

"[I]f it shall appear to this court that the district court erred in discharging [the prisoner] on habeas corpus, such action may be reviewed by and through a supervisory writ issued under the power of superintending control conferred by section 86 of the Constitution." 253 N.W. at 745.

As the language suggests, we will exercise our superintending jurisdiction through a supervisory writ where the issuance of a writ of habeas corpus is predicated upon an error of law.

The district court's order was based upon a determination that placement of Collins and Schroeder in AI deprived them of certain liberties guaranteed by the Fourteenth Amendment to the United States Constitution, entitling them to certain minimum procedures appropriate under the circumstances.

The district court's memorandum opinion states that "administrative isolation involves loss of privileges normally afforded inmates, together with greater restrictions on freedom of movement and communication". Nowhere does the trial court enunciate what lost privileges or restricted freedom triggered these Fourteenth Amendment safeguards. A brief submitted to the district court by the prisoners did, however, claim that institutional employment is precluded and that opportunities for education, visitation, and exercise are hampered. These same grievances are addressed in the brief they submitted to this court. We are informed that Collins worked in the hobby shop and in the kitchen before being placed in AI, while Schroeder was employed in the prison's sign shop. Apparently neither prisoner was taking advantage of any educational opportunities prior to being placed in AI, but counsel informs us that at least one of them is now interested in taking a class.

Though the district court, in its memorandum opinion, relied only upon *Wolff v. McDonnell, supra,* counsel for Collins and Schroeder stresses *Kelly v. Brewer,* 525 F.2d 394 (8th Cir. 1975), a case involving prisoners who had been placed in "administrative segregation" at the Iowa State Penitentiary. In *Kelly,* the Court of Appeals held that due process required that a determination that a prisoner be placed in administrative segregation be made by the warden, and that in making such a determination he should set out his reasons therefor, identifying the criteria and standards employed in reaching his determination.

We do not, however, consider the Iowa State Penitentiary administrative segregation necessarily equivalent to the AI unit in

North Dakota. We see striking contrasts. Kelly's conditions of confinement at first were described by the Federal District Court as "subhuman and subanimal"; where he was confined in a dark cell, naked, and without sanitary facilities except for a built-in commode. Though the Court of Appeals did not reach this question, the district court held that this treatment constituted "cruel and unusual punishment". Apparently conditions gradually improved, but Kelly rarely was permitted outside his cell. *Kelly v. Brewer,* 378 F.Supp. 447 (S.D. Ia.1974).

In the instant case, no such extreme treatment is even alleged. Counsel for the prisoners stated during oral argument that, "I don't want to pretend the conditions out at the North Dakota Penitentiary were the same as the ones in *Kelly v. Brewer*". He said that the situations are, however, comparable in that they both involve administrative segregation as opposed to a disciplinary action.

Collins and Schroeder maintain that circumstances indicate that their confinement in AI is for the purpose of punishing them rather than for the security of the institution. We can find no such conclusion in the memorandum opinion of the district court. It may help put things in perspective, however, to view conditions in AI as argued by the prisoners and set forth in Section 505(6), North Dakota State Penitentiary Administrative Regulations, *supra,* as compared to those prescribed for disciplinary segregation in Inmate Handbook, North Dakota State Penitentiary and State Farm 29–30 (January, 1977):

"1. Any inmate sent to Disciplinary Segregation should be escorted by an Assistant Deputy who will be responsible for logging in the hospital roster, the hospital log book, and the hourly detention check log, the inmate's name, assigned cell, date and time in, and date and time to be released.

"2. Before entering D.S., inmates will be strip shaken by the Assistant Deputy with the hospital or other officer assisting, and all of the inmate's clothes and personal effects will be bagged up and tagged and placed in a box in the hallway along with an inventory slip. The inmate will then be dressed out in coveralls and socks and placed in a cell.

"3. *Smoking*—There will be no smoking or chewing tobacco allowed in D.S. Any officer or staff member will not be allowed to smoke while in D.S. for whatever reason.

"4. *Meals*—Inmates in D.S. will be served regular meals on trays using plastic eating utensils. When the trays and utensils are picked up, the hospital officer will ensure all items are accounted for. If an inmate throws his food out, the Assistant Deputy has the authority to order sandwiches served to that individual until his behavior improves. These are to be served on a paper plate; his drink to be served in a styrofoam cup.

"5. *Personal effects*—Inmates in D.S. will be allowed to have in their possession a toothbrush, toothpaste, and comb.

"6. *Bedding*—Inmates in D.S. will be allowed a mattress, pillow, and no more than two blankets. Sheets and pillowcases are not allowed. Any destroyed State property will be paid for by the inmate.

"7. *Cell cleaning*—Inmates in D.S. will be allowed to sweep and mop their cells on Wednesday evenings. Inmates will be rolled out one at a time, and an additional officer must be present to assist the hospital officer at this time.

"8. *Showers*—Inmates in D.S. will shower on Mondays, Wednesdays, and Fridays. This will normally be done after the final count but may be done anytime during the scheduled shower day at the Assistant Deputy's discretion. Two officers must always be present to super-

vise during showers. Inmates may be issued a clean pair of socks on shower days and a clean pair of coveralls on Fridays. Underwear is not allowed.

"9. *Reading materials*—The Bible and religious writings are the only reading materials to be made available to inmates in Disciplinary Segregation, and the amount of this allowed to be kept in a cell is to be within reason.

"10. *Mail*—Inmates in D.S. will be allowed mail from judges, courts, or attorneys. All other mail will be held until the inmate's release from Disciplinary Segregation.

"11. *Letters*—Inmates in D.S. may be allowed state writing paper and pencils to write legal writs or grievances and be given a reasonable amount of time to complete their work. The hospital officer will ensure paper and pencils are turned in on completion. Social correspondence is not allowed.

"12. *Phone calls*—Inmates in D.S. are not allowed phone calls. If they wish to consult an attorney they may do so · by writing a letter.

"13. *Visits*—Inmates in D.S. may be allowed to visit members of his immediate family or other individuals on visiting list at the Assistant Deputy's discretion. If the inmate is out of control, his visit may be withheld. No other outside visitors will be allowed to visit. When an inmate is called out of D.S. for a visit he will dress out in his khakis and the hospital officer will inform the Assistant Deputy that the inmate is ready to be escorted down for the visit. The hospital officer will also ensure that the inmate has no cigarettes or matches in his pockets. On completion of the visit, the inmate will be escorted back to D.S., strip shaken, and placed in coveralls before he is returned to his cell.

"14. *Counselor and staff visits*—Any visits from D.S. by a counselor or staff member must be cleared by the Assistant Deputy. These visits are to be made in the hospital T.V. room or a counseling room in the hospital area. Any other areas for a visit must be cleared by the Assistant Deputy. On completion of the visit, the inmate will be escorted back to D.S. and shaken down before being returned to his cell.

"15. *Attorney visits*—Any attorney visits to an inmate in D.S. must be cleared by the Deputy Warden."

We realize that the prisoners do not ask much more procedurally than was given them. They ask only that they be given, in writing, reasons for continuance in AI, as well as identification of the criteria and standards employed in reaching the determination. Section 505(10), North Dakota State Penitentiary Administrative Regulations, *supra,* specifically states that recommendations for continuance in AI or release to the general population be submitted to the warden "with the reasons clearly stated". Although it does not appear from our reading of the regulations that this directive was followed here, the warden acknowledges in his brief that "The State is willing to concede that record entries need improvement to better document the action taken and the reason for such action · . · . ."

In light of this concession, we get the impression that the warden·has not requested us to quash the district court's order because of what that order requires of him so much as because it represents a judicial intrusion into prison administration. This concern, which was argued forcefully in the brief and in oral argument, is a legitimate one. The administration of a penitentiary is a singular responsibility, many aspects of which are completely outside the experience of a layman, an attorney, or a judge. For this reason, even well-intentioned judicial intervention into the workings of a prison could create problems.

A warden must sometimes act quickly to avoid an explosive situation within the prison. He must sometimes base decisions upon conclusions stemming from his experience, and may not be able to always specifically identify the criteria upon which his decision is based.

The warden testified to the district court that prisoners are not placed in AI for specific violations but only "when it is part of a pattern, when we have reason to believe it is part of a bigger problem." He stated that Collins and Schroeder were suspected of trafficking in narcotics, and that this was a serious problem at the penitentiary. He said that narcotics had been found in Collins' cell before and that Collins' financial transactions indicated he could be involved in drug dealings.[1] It would appear that the warden had reason to believe that these prisoners were involved in the drug problem, but he had no strong proof. He apparently believed that the placement of Collins and Schroeder in AI would help alleviate the problem.

■ On the other hand, though the nature and requirements of the institution require a diminution of the prisoners' rights, imprisonment does not preclude certain constitutional protections. *Wolff v. McDonnell, supra,* and cases cited therein. *Wolff,* after balancing institutional interests against the need for certain due process procedures as required in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), determined that certain requirements of *Morrissey* were not appropriate. It would require a similar analysis, should it be determined that due process was violated in this case, to determine the minimum procedures required.

■ We believe, however, that the United States Supreme Court has determined that the present situation is not subject to the Due Process Clause of the Fourteenth Amendment. Our reading of *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), leads us to conclude that

Collins and Schroeder, by their placement in AI, were not deprived of a "liberty" interest within the meaning of the Due Process Clause.

In *Meachum,* prisoners were transferred from a medium security institution within the Massachusetts prison system to a maximum security institution in the same system. It is noteworthy that one of the prisoners was suspected of trafficking in drugs and was originally assigned to administrative segregation before it was decided that he be sent to a maximum security institution along with the others. Though the prisoners were afforded a hearing, they claimed it did not reach due process standards. Justice White, writing for the majority, did not reach a determination of appropriate standards, as he concluded that the deprivations complained of were not sufficient to invoke the procedural protections of due process. In his opinion, Justice White said:

"We reject at the outset the notion that any grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause. . . .

"Similarly, we cannot agree that any change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause. The Due Process Clause by its own force forbids the State from convicting any person of crime and depriving him of his liberty without complying fully with the requirements of the Clause. But given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and to subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution.

. . .

1. These considerations apparently first surfaced after the writ of habeas corpus was applied for. There is nothing in the record to indicate that the prisoners were so apprised prior to applying for the writ.

"Our cases hold that the convicted felon does not forfeit all constitutional protections by reason of his conviction and confinement in prison. He retains a variety of important rights that the courts must be alert to protect. *See Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974), and cases there cited. But none of these cases reaches this one; and to hold as we are urged to do that any substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." *Id.* at 96 S.Ct. 2538.

■ Though *Meachum* involved transfer between two prisons rather than between two areas of one prison, we deem it dispositive of the Constitutional Due Process issue in the instant case. The focus of our inquiry is not on whether or not the prisoners were moved a great distance. *Meachum* says the nature of the loss to the prisoner determines whether the Fourteenth Amendment applies. *Accord, Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). *Meachum* cannot, therefore, be distinguished on the ground that it involved an inter-prison transfer rather than an intra-prison transfer. *See Cooper v. Riddle,* 540 F.2d 731 (4th Cir. 1976); *Franklin v. Fortner,* 541 F.2d 494 (5th Cir. 1976).

In *Meachum* the losses complained of resemble those complained of by Collins and Schroeder: Loss of employment and contact with counselors as well as generally more restrictive conditions. *Id.* at 96 S.Ct. 2543 n. 5.

Notwithstanding that we have thus concluded that the privileges of which the prisoners herein have been denied do not invoke the protection of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, we believe that in applying paragraph 10, Section 505 of the prison regulations, the reasons for continuing the prisoners in AI could have been and should have been more specifically explained in writing. If to do so would have constituted a serious risk to the security of the institution, that statement should have been made in lieu thereof.

■ We believe that an institution which is established not only as a confinement facility, but as a rehabilitation facility which adopts rules by which discipline therein is to be maintained with incentives for good conduct not only while a prisoner is in the institution, but also, hopefully, when the prisoner is released, should conscientiously attempt to follow its own rules. It is our view that when those rules are followed, especially when they have been officially promulgated and distributed to the inmates of the institution and to its officers and employees as the law within the institution,[2] respect for the law is enhanced, but where those rules are not followed, respect for the law is diminished.

"Rules and regulations of an administrative agency governing proceedings before it, duly adopted and within the authority of the agency, are as binding as if they were statutes enacted by the legislature. Procedural rules are binding upon the agency which enacts them as well as upon the public . . . and the agency does not, as a general rule, have the discretion to waive, suspend, or disregard in a particular case a validly adopted rule so long as such rule remains in force. This is true even though the adoption of the rule was a discretionary function, and plenary powers, or powers resting in the 'absolute discretion' of an agency, may thus be rendered subject to procedural limitations. To be valid the action of the agency must conform to its rules which are in effect at the time the action is taken, particularly those designed to provide procedural safeguards for funda-

---

**2.** Authority and procedure for promulgation of administrative regulations by the warden are set forth in Section 12–47–12, N.D.C.C. The warden is, however, not subject to the Administrative Agencies Practice Act. *See* Section 28–32–01(2), N.D.C.C.

mental rights." 2 Am.Jur.2d *Administrative Law* § 350 (1962).

*Accord, State ex rel. Independent School District v. Johnson,* 242 Minn. 539, 65 N.W.2d 668, 673 (1954).

We accordingly quash the writ of the trial court, but in so doing, we substitute our writ directing the warden to forthwith enter upon the appropriate records of the State Penitentiary, more specific reasons for the continuous retention of the prisoners in AI subject to what we have heretofore said herein, permitting an exception when the security of the institution requires that specific reasons not be given.

The writ of the trial court dated February 11, 1977, requiring the release of the prisoners from administrative isolation, is hereby quashed and the clerk of this court is hereby directed to issue a writ from this court, pursuant to this opinion.

VOGEL, PEDERSON, PAULSON and SAND, JJ., concur.