Elaine LITTLE, Director of the Department of Corrections and Rehabilitation, State of North Dakota, Petitioner,

v.

The Honorable Benny A. GRAFF, Judge of the District Court, South Central Judicial District, State of North Dakota, and Sheila Sheppard, Respondents.

Civ. No. 930224.

Supreme Court of North Dakota.

Sept. 29, 1993.

Edwin F. Zuern (argued), Sp. Asst. Atty. Gen., Atty., Bismarck, for petitioner. Appearances by Elaine Little, Director of the Dept. of Corrections and Rehabilitation and Timothy Schuetzle, Warden, North Dakota State Penitentiary.

Rolf P. Sletten (argued), Bismarck, for respondents.

MESCHKE, Justice.

We hold that it was not an error of law for the trial court to conclude that the warden does not have the statutory authority to confine at the prison all women convicts who are sentenced to the Missouri River correctional center. Therefore, we decline to vacate the trial court's writ of habeas corpus ordering a woman prisoner transferred from the prison to the Center.

■ Unlike penological practice elsewhere, the North Dakota Legislature has authorized the sentencing judge to designate the initial place of a convict's confinement. NDCC 12.1–32–02(1); *State ex rel. Olson v. Maxwell*, 259 N.W.2d 621 (N.D.1977). Depending on the length of imprisonment, the sentencing judge may select among a county jail, a regional correction center, a state correctional facility, or the Missouri River correctional center (Center). NDCC 12.1–32–02(1)(c)(1). With few exceptions, a judge "may commit to the Missouri River correctional center, so far as the capacity of the center shall permit, all persons ... where the sentence is more than thirty days but not more than one year...." NDCC 12–51–07. The Center is intended "as a work and treatment center for the purpose of assisting in the rehabilitation of the prisoners committed thereto" through "labor, instruction, and supervision that will accomplish the purpose sought...." NDCC 12–51–02. In 1991, through 1991 N.D.Laws ch. 116, § 4, codified at NDCC 12–51–01, the Legislature changed the name of the Center from the "North Dakota state farm" and designated the Center for confinement of both "male and female violators of the law."

Administration of the Center, which is "deemed a facility of the state penitentiary and must be operated in connection therewith," is delegated to the warden of the penitentiary. NDCC 12–51–04. "The laws relating to the government and management of, ... the penitentiary, *so far as* the same may be applicable and *not inconsistent with the provisions of*" chapter 12–51, "apply to the government and management of" the Center. NDCC 12–51–05 (emphasis added). NDCC 12–51–06 empowers the warden, with approval of the director of corrections, to "establish, adopt, and enforce proper rules and regulations *consistent with the provisions of*" chapter 12–51 to administer the Center and prisoners there. (emphasis added).

For specific reasons listed in NDCC 12–51–09, the warden may transfer a prisoner from the Center to the prison "at the time of commitment or at any time thereafter." To transfer someone, the warden must properly determine that it is necessary to do so "for purposes of safety of other inmates or of the general public or for the purpose of discipline or medical care...." *Id.* Once a person is at the Center, the warden may also transfer someone who "interferes with the operation of the center, or with the welfare or safety of others, *and* where in the judgment of the warden the best interests of such person or the best interests and welfare of other persons committed to the center so require, ...." *Id.* (emphasis added). This case concerns the power of the warden to hold all female prisoners at the prison because of their gender, even when specifically committed by the sentencing judge to the Center.

The Cass County district court revoked Sheila Sheppard's probation in March 1993, and sentenced her to the Center for one year. At that time, the warden had closed the female wing at the Center and was holding every female prisoner at the prison, even if a sentencing court had committed her to the Center. Instead of confining Sheppard at the Center, the warden held her at the prison.

In April, Sheppard petitioned the Burleigh County district court to compel the warden and director of corrections to transfer her from the prison to the Center. For various irrelevant reasons, her repeated petitions were summarily refused by both Burleigh

County and Cass County district courts. Eventually, she asked this court on May 19 for a writ of habeas corpus. On May 26, we exercised our supervisory powers to direct the Burleigh County district court to appoint counsel for Sheppard and to hear her petition for habeas corpus.

After a hearing on June 16, the trial court found:

[T]here has been no prior determination by the Warden of the State Penitentiary that the safety of other inmates, the safety of the general public, disciplinary reasons, or medical reasons make it necessary or proper to confine [Sheppard] at the State Penitentiary rather than the Missouri River Correctional Center.

Additionally, the Court finds that neither the safety of other inmates, the safety of the general public, disciplinary reasons, or medical reasons make it necessary or proper to confine [Sheppard] at the North Dakota State Penitentiary rather than the Missouri River Correctional Center.

The trial court concluded that the Center was statutorily established for both male and female convicts, that Sheppard was unlawfully detained at the prison, and that "by refusing to confine [Sheppard] at the ... Center because she is a female person, [the warden and director of corrections] have violated [Sheppard's] rights under the statutes of the State of North Dakota." On June 22, the court ordered the warden to transfer Sheppard to the Center by July 6 to serve the rest of her sentence.

This court, on June 23, summarily denied the warden's petition for mandamus to derail the trial court's transfer order. The warden appealed the trial court's writ of habeas corpus on June 29. On July 6, we dismissed this appeal from a non-appealable order.

On July 8, the director of corrections and the warden petitioned this court to vacate the habeas corpus writ that compelled Sheppard's transfer. They also sought a stay of the transfer. That same day, we denied the stay "for lack of a proper showing." Pursuant to *State ex rel. City of Bismarck v. District Court*, 64 N.D. 399, 253 N.W. 744 (1934) and *Havener v. Glaser*, 251 N.W.2d 753 (N.D.1977), we also agreed to exercise our superintending jurisdiction to review whether the trial court's habeas order was based upon any error of law.

Because the warden had not yet moved her to the Center, Sheppard asked the trial court on July 8 to find the warden in contempt. On July 12, the warden moved the trial court to reconsider the transfer order on grounds that he had recently become "aware of a Clay County Minnesota felony complaint and summons" against Sheppard, that he had contacted Minnesota authorities and verified the "complaint," and that, under prison policies, a felony complaint "disqualifies an inmate from retaining a minimum security classification" so that Sheppard was "not qualified for transfer" to the Center.

On July 13, the trial court held a hearing on an order to the warden and the director of corrections to show cause why they had failed to transfer Sheppard to the Center. The court found that the evidence presented "does not establish a valid basis upon which [the warden] can hold [Sheppard] at the State Penitentiary rather than the Missouri River Correctional Center." The court denied the motion for reconsideration, found the warden and director in contempt, and ordered that, if Sheppard was not promptly transferred, the warden be jailed until Sheppard was moved to the Center. The warden moved Sheppard to the Center that same day.

On review, the warden argues that he has "determined after several attempts, given the available resources, that to make the Center co-ed will not work." In a vague way, he claims that "[t]oo many problems were encountered" and that "available resources simply were not sufficient to accomplish the task." Placing the onus solely on women prisoners, the warden believes that "[i]t has been the actual experience of correctional ... officials that when women were at the [Center] that they were worse off and less capable of fulfilling their rehabilitation objectives." The warden has returned all females to the prison, and confines all new female convicts there instead of the Center, even when they have been sentenced to the Center.

The warden concedes that the Legislature has not changed the law designating the Center for both male and female convicts, but explains that "corrections officials" were too busy with other matters to ask the 1993 legislative session to change the law, and that they believed that amendment of the law was "not immediately necessary" because "other statutory authority granted corrections officials the authority to transfer and retain the females" at the penitentiary. Now, the warden realizes "[t]his was apparently a miscalculation."

The warden cites and quotes many decisions from elsewhere, particularly the federal system, for his argument that an inmate has no right to choose her place of confinement, and that "'prison officials may move a prisoner for any reason or no reason at all.'" The warden's reliance on law elsewhere is unjustified. This case does not involve Sheppard's right to pick and choose her place of confinement. Rather, it involves the statutory power of a sentencing judge to select the initial place of confinement. As Justice Sand clarified, in his separate opinion in *State ex rel. Olson v. Maxwell*, 259 N.W.2d at 633, it is the prisoner that has the necessary personal interest for standing to enforce the sentencing judge's selection of the initial place of confinement.

"[T]he statutes of this State contemplate that the sentencing judge shall determine initially the place of confinement." *State ex rel. Olson v. Maxwell*, 259 N.W.2d at 625. *Maxwell* explained:

[T]he fixing of the place of imprisonment is within the discretion of the trial court, in the first instance, and not that of the [prison officials]. Cases cited ... for the contrary position are based upon totally different statutory schemes.

259 N.W.2d at 625. *See* 21 Am.Jur.2d *Criminal Law* §§ 607, 608, and 620 (1981). The sentencing statutes in North Dakota remain essentially as they were at the time *Maxwell* was decided, and the power of the sentencing judge to select the initial place of imprisonment has not been changed.

The warden argues that *Maxwell* is "a sixteen year old case whose authority has been questioned in *Kelly [Kelley] v. Powers*,

477 N.W.2d 586 (ND 1991)." The warden misreads *Kelley*. There, we distinguished *Maxwell's* holding on the constitutional status of a prisoner to object to an interstate transfer, but we did not overrule nor question *Maxwell's* description of North Dakota's statutory framework that authorizes a sentencing judge to initially select the place of a convict's confinement.

Still, the warden argues that he has considerable "authority to retain certain inmates at the prison rather than at the [Center]," including "the right and authority to remove and not retain at the Center anyone including all females, if he finds that they, in keeping them there, '... interferes with the operation of the center.'" For his position, the warden cites and quotes NDCC 12–51–09. His argument is that this section "authorizes the warden to determine the need to remove all females from the Center because it is not in the females nor the males '... best interest and welfare ...' to keep females at the Center." In effect, the warden argues that he can supersede the legislative designation of the Center for both males and females by dislocating only the females. He is mistaken. *Berger v. State Personnel Board*, 502 N.W.2d 539, 542 (N.D.1993) ("Even a long-established administrative policy must be set aside if it violates the intent of statute"); *Moore v. North Dakota Workmen's Compensation Bureau*, 374 N.W.2d 71, 75 (N.D.1985) (An agency's "authority does not extend to the promulgation of an administrative regulation, or the application of a regulation in such a fashion, that is wholly inconsistent with the dictates of the Legislature."). *Compare* NDCC 28–32–02(1), 28–32–19(1), and 28–32–19.1(3). The warden must exercise his powers in a manner consistent with Chapter 12–51 of the North Dakota Century Code.

The warden no doubt would have the power to move an individual from the Center to the prison for an individualized reason of safety, discipline, or medical care, or for particular conduct that interferes with the usual operation of the Center or with the welfare, safety, or best interests of other persons there. Those reasons would be consistent with NDCC 12–51–09. And, the warden may

develop policies to classify and identify individuals who should be transferred for those reasons. NDCC 12–51–06. But he claims too much power when he argues that he can ignore the law and exclude the use of the Center by a sentencing judge for an entire category based on gender.

▆▆▆ Gender bias is generally unlawful. NDCC 14–02.4–01 says: "*State policy against discrimination.* It is the policy of this state to prohibit discrimination on the basis of ... sex, ... to prevent and eliminate discrimination in ... state and local government services, ... and to deter those who aid, abet, or induce discrimination, or coerce others to discriminate." *See also* NDCC 12.1–14–04, 12.1–14–05, and 34–06.1–01. The warden cannot categorically exclude all women from the Center when the Legislature has authorized sentencing judges to place women there.

The warden's disparate treatment of women, blaming them for all the problems that led him to refuse the use of the Center for female convicts, reminds us of the attitude characterized as "suspect" by the United States Supreme Court in *Turner v. Safley,* 482 U.S. 78, 99, 107 S.Ct. 2254, 2267, 96 L.Ed.2d 64 (1987):

> The District Court found that the Missouri prison system operated on the basis of excessive paternalism in that the proposed marriages of *all* female inmates were scrutinized carefully even before adoption of the current regulation—only one was approved at Renz [Correctional Institution] in the period from 1979–1983—whereas the marriages of male inmates during the same period were routinely approved. That kind of lopsided rehabilitation concern cannot provide a justification for the broad Missouri marriage rule.

There is no legal justification for this warden's "lopsided" exclusion of women from the Center.

Still, the warden insists that there is no constitutional question in this case, and argues that "any 'equal protection' claim must ... fail." The warden points out that the trial court decided this case on statutory grounds, not constitutional grounds. So do we. ▆▆▆▆

▆▆ If a statute is susceptible of more than one construction, one that would make it of doubtful constitutionality and another that would not, the latter construction must be adopted. For recent examples, *see NSP v. North Dakota Public Serv. Comm'n,* 502 N.W.2d 240, 245 (N.D.1993); *In the Matter of the Adoption of K.A.S.,* 499 N.W.2d 558, 566 (N.D.1993). Courts refrain from deciding constitutional questions if they can decide a dispute on other grounds. *Minot Daily News v. Holum,* 380 N.W.2d 347 (N.D.1986). Besides, we seek to harmonize related statutes, *Continental Casualty Co. v. Kinsey,* 499 N.W.2d 574, 580 (N.D.1993), and give meaning to every part. *County of Stutsman v. State Historical Society,* 371 N.W.2d 321 (N.D.1985). To construe the warden's transfer powers under NDCC 12–51–09, to allow his lopsided exclusion of all women prisoners from the Center, would render meaningless the legislative direction that the Center be used to confine women as well as men.

▆▆ We do not say that women prisoners cannot constitutionally be confined separately from men. *See B.H. v. K.D.,* 506 N.W.2d 368 (N.D.1993) ("[G]ender-based classifications are not ipso facto invalid...."); *City of Mandan v. Fern,* 501 N.W.2d 739, 744 (N.D. 1993) ("[S]ex discrimination is not unconstitutional if it is substantially related to the achievement of important governmental objectives."). There are differences between the sexes that permit their reasonable separation for nondiscriminating reasons, including valid penological interests in corrections and treatment. For examples, *see Smith v. Bingham,* 914 F.2d 740 (5th Cir.1990); *Pitts v. Thornburgh,* 866 F.2d 1450 (D.C.Cir.1989); *Lamb v. Maschner,* 633 F.Supp. 351 (D.Kan. 1986). Yet, Supreme Court decisions interpreting the equal protection guarantees "establish that the party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an 'exceedingly persuasive justification' for the classification." *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982) (citations omitted). That kind of constitutional question is not presented here.

In this case, the Legislature designated the Center to be used for rehabilitation of both males and females.

■ Persisting, the warden argues nevertheless that Sheppard "was housed in a legally acceptable minimum security female unit in the prison that meets her specific sentence," referring to a separate unit in the prison maintained under the authority of NDCC 12.1–32–02(9):

> A court may commit a female offender to the state penitentiary or other suitable facility under the same minimum security restrictions and with the same privileges as Missouri River correctional center inmates when the sentence imposed is more than thirty days but not more than one year.

The sentencing court did not commit Sheppard to the state prison, nor to the female minimum security unit there.

■ Finally, the warden argues that the trial court erred in insisting on Sheppard's transfer to the Center, after being "made aware that the female had a felony complaint against her from another state, disregarding the prison's classification process and the standard procedures applied under the Interstate Agreement on detainers." It was only after Sheppard had been ordered transferred to the Center that the warden became "aware" of the felony complaint against Sheppard in Minnesota. The trial court denied reconsideration based on this ploy, finding that the warden's evidence "does not establish a valid basis" to hold Sheppard at the prison, instead of the Center. We agree.

The documents that the warden obtained from Minnesota show that, on June 10, 1993, Sheppard was charged by a complaint there with three felony counts of wrongfully obtaining welfare assistance. This record indicates, however, that the judge in Minnesota, who made a finding of probable cause for the complaint, issued only a summons to appear and deleted the references to a warrant and to an order of detention on the printed form. We are not convinced that an appropriate officer of Minnesota has made a written request for temporary custody or availability of Sheppard for disposition of that complaint, or that the court having jurisdiction of that complaint has duly approved, recorded and transmitted that request pursuant to Article IV of the Interstate Agreement on Detainers, which is the law that the warden relies on. *See* NDCC ch. 29–34; *Runck v. State*, 497 N.W.2d 74, 79 (N.D.1993). The warden has not called our attention to any other governing rule or law. Under these circumstances, we do not believe that the trial court's denial of reconsideration was an error of law.

We conclude that there was no error of law by the trial court in issuing the writ of habeas corpus to order the transfer of Sheppard from the prison to the Center. Correction officials should not misunderstand, or overreact to, the scope of our holding. We do not say that the Legislature cannot provide for confinement of women prisoners in an equivalent facility separate from men. We say only that, when the Legislature has authorized both men and women to be sentenced to the Center, or any other place of detention, correction officials operating the facility cannot override the law for a reason of gender alone.

Nor do we prohibit the warden from making policies or creating classifications for managing prisoners, so long as those policies and rules are consistent with the law. If the warden regards any law affecting operation of the corrections system as too burdensome, cumbersome, or expensive, he should address his concerns to the Legislature, not this court. He cannot use his administrative powers to amend or change the law to his liking.

Because there was no error of law, we decline to supervise the trial court's issuance of habeas corpus in this case.

VANDE WALLE, C.J., and LEVINE, NEUMANN and SANDSTROM, JJ., concur.