STATE, Respondent v. ORRICER, Appellant

(120 N.W. 2d 528)

(File No. 9969. Opinion filed March 13, 1963)

**Martin Weeks,** Vermillion, for Defendant and Appellant.

**A. C. Miller,** Atty. Gen., **D. J. McClure,** Asst. Atty. Gen., Pierre, **Theodore J. Dolney,** State's Atty., Vermillion, for Plaintiff and Respondent.

LUND, Circuit Judge. The appellant, Charles Orricer, was charged with burglary in two counts; viz., burglary in the second degree, and burglary in the third degree. The jury returned a verdict finding the appellant guilty of burglary in the second degree, and he was sentenced to fifteen years in the penitentiary. From such judgment, and order denying a new trial, he appeals.

On November 13, 1960, at about 3:40 a.m., two police officers of the City of Vermillion, while making a routine patrol of the business places, looked through the front window of Tom & Bud's Super Valu Store, and noticed that the dial and handle had been removed or knocked off the store safe, and that there

was a brown putty-like substance along the top, bottom, and the left edge of the door, and it also appeared to have been beaten with a hammer or heavy object.

The officers then began checking the entrances and found a door on the southeast corner open. As they proceeded around the corner into an alley running north and south, they saw two men walking towards the center of the alley. One of the officers called to them, telling them to "hold it where they were" as they were police officers. Immediately both of the men began to run; one ran north up the alley, and the other through the back of a laundromat located east across the alley. The officers were approximately sixty feet from the men just prior to the time they turned and ran. There was a street light directly over the alley area. The man who ran north carried a brief case and was later positively identified by one of the officers as being one Lawrence Geelan. The other man, who ran back through the laundromat, was described as being much larger than the other, slightly over six feet, weighing between 190 and 200 pounds, wearing dark trousers, a light yellow or gold-colored bulky knit sweater, and wearing glasses. About forty or fifty minutes later that morning, police officers apprehended the appellant driving a 1954 Buick car owned by Lawrence Geelan. One of the officers identified him as being the same height and weight, wearing glasses and the same type of clothing, and that he looked like the larger man he had seen in the alley. A bottle of Benzedrine tablets and three gloves were found in the car being driven by appellant. Two of these gloves comprised a pair, and on the fingers of the pair of gloves were brown putty-like smears. Officers later discovered a brief case in a truck box approximately one-half block away from the scene of the burglary, containing a hammer, a bar of Fels Naphtha soap, and a bottle of an explosive substance, and other articles. Various tools were also found around the rear door through which the burglars had gained access to the store, and inside the store a length of bell wire and two batteries were found.

The appellant was placed under arrest, and later, on November 18, appeared with his attorney and waived preliminary hearing. He was bound over for trial to the March, 1961, term of

the Circuit Court, and bond of $15,000 was ordered and not furnished. The appellant was lodged in the Clay County jail.

On November 21, 1960, the sheriff and State's Attorney of Clay County made an ex parte application to the Circuit Court to transfer appellant for safekeeping from the county jail of Clay County to the State Penitentiary. After a hearing on said application, the Circuit Court entered its order, finding that the Clay County jail did not have facilities or personnel to adequately guard and care for the said Charles Orricer, and that there were no suitable facilities available in adjoining counties for the care of said prisoner, and ordered that he be immediately transferred to the care, custody, and control of the Warden of the State Penitentiary until he should furnish satisfactory bond, or until the March term of the Circuit Court, at which time the said Charles Orricer was to be returned to the custody of the sheriff of Clay County; said order further providing that Clay County pay the expenses of keeping and maintaining said prisoner in the penitentiary.

Pursuant to this order, the appellant was transferred to the penitentiary where he remained until February 27, 1961, at which time he was transferred back to the county jail of Clay County. Appellant was arraigned on March 6, and his trial in Circuit Court commenced on March 21, 1961.

At the commencement of the trial appellant moved for dismissal of the charges against him, claiming that his transfer to and detention in the penitentiary was illegal, and in violation of his constitutional rights, and that he was thereby subjected to unreasonable, unnecessary, and unlawful restraint; that he was denied the effective use of counsel and the opportunity to properly prepare for trial or to procure witnesses; that he was placed in jeopardy twice for the same offense and was denied a preliminary hearing, and was therefore denied due process of law. This motion for dismissal was denied and error is assigned.

The crucial issue presented by this assignment is whether the acts complained of actually prejudiced appellant or tended to his prejudice, in respect to a substantial right, whereby he was necessarily prevented from having a fair trial.

■ Appellant's first contention that he was entitled to be present at the hearing on the sheriff's application to transfer him to the penitentiary for safekeeping is clearly without merit. So far as this court is concerned, the question has been settled adversely to the appellant. State v. Pearse, 19 S.D. 75, 102 N.W. 222; State v. Parks, 34 S.D. 510, 149 N.W. 161.

■ As to appellant's next contention, it is conceded that there is no statutory authority for his transfer to, or detention in the penitentiary for safekeeping. However, we fail to comprehend how this fact, in and of itself, violated any of his rights under the Constitution, or in any manner tended to his prejudice in respect to a substantial right. We, therefore, deem it unnecessary to pass upon the question as to the inherent power of the court to issue such an order of transfer under the circumstances shown.

■ The measure of the protection afforded one charged with a crime in the courts of this state is set forth in Section 7, of Article 6, of the State Constitution, which provides: "In all criminal prosecutions the accused shall have the right to defend in person and by counsel; to demand the nature and cause of the accusation against him; to have a copy thereof; to meet the witnesses against him face to face; to have compulsory process served for obtaining witnesses in his behalf, and to a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed." See also SDC 1960 Supp. 34.2905.

The record discloses that appellant retained the services of at least one attorney at all times prior to the trial, and during the time that appellant was confined in the penitentiary there does not appear to be anything in the record indicating that he was denied the right to consult or communicate with his attorney, but to the contrary, the record shows that he did communicate with his attorney. It further appears that he was allowed to visit with his sister and in fact was allowed all of the privileges in this respect that he would have had if confined in the county jail. The fact that he was denied other visitors, who, he claims, were witnesses in his behalf, did not violate any substantial right, as subpoenas could have been issued by his attorneys requiring the attendance of such witnesses at his trial. Appellant was returned to the

Clay County jail from the penitentiary on February 27, 1961, almost thirty days prior to the commencement of his trial. At the trial he was ably represented by two attorneys, and it does not appear that any compulsory process was issued by the appellant for the attendance of witnesses in his behalf, nor was there any motion made for continuance of the trial because of the absence of witnesses.

■ Appellant also contends that he was released from the penitentiary on a writ of habeas corpus and that under the provisions of SDC 1960 Supp. 37.5506, the court was without jurisdiction to place him on trial on the original charge filed against him, or without the filing of a new complaint and after a preliminary hearing, and that he was thereby denied due process of law. This contention is only a claim made by appellant in his brief and is entirely without merit as there is nothing in the record showing such a writ or the terms of any order entered thereon.

■ In disposing of appellant's claim of double jeopardy, we wish to point out that the only theory upon which a plea of jeopardy may be sustained is that a party has had a legal trial; and if he has not had a legal trial, then the jeopardy has not attached. State v. Reddington, 8 S.D. 315, 66 N.W. 464; Kepner v. United States, 195 U.S. 100, 24 S.Ct. 797, 49 L.Ed. 114.

■ Two expert witnesses testified for the state, Captain Robert J. Earl, a demolition officer from Ellsworth Air Force Base, at Rapid City, South Dakota, and William A. Heilman, Laboratory Examiner of the Federal Bureau of Investigation. No question is presented as to their qualifications.

Captain Earl arrived in Vermillion in the afternoon of November 13, and immediately made an examination of the safe and the exhibits contained in the brief case.

Appellant claims that the court erred in overruling an objection to a question asked Captain Earl on direct examination, and that such ruling of the court was prejudicial to appellant and misleading to the jury, as it assumed a fact which was not in evidence. The question complained of is as follows: "Q. Would you explain Captain Earl, what method was used to convey the

suspective explosive substance into the crack around the door, the wall of the safe is perpendicular, and how is that to be accomplished?"

In considering the objection in the light of the testimony immediately preceding and following the question, it is clear the court's ruling was not prejudicial. The question was intended to elicit information as to how an explosive substance may be conveyed into a safe. It is undisputed that there was soap imbedded in the cracks of the safe, along the top of the safe door, and down the front end, and that soap is commonly used as a tamping agent, or sealer, to hold the explosive within the door of the safe. This is further indicated by the witness' answer to the question, as follows:

"A. Well the soap, is used as a channel, it makes sort of like a little ledge at the top corner to allow the liquid to flow into the safe, this is one of the main reasons why the top corner of the safe was pryed slightly to allow the insertion of the liquid, then the soap acts as a tamper to prevent the liquid from running out of the door of the safe. Does that answer your question?

"Q. Yes. Now did it appear to you, that there had been a substance, other than soap, inserted into the area of the safe door opening?"

"A. Well, actually by looking at the outside of the safe, I could not tell whether an explosive had been inserted in the safe, but I had to assume it had been."

■ Appellant also predicates error on the court's ruling in permitting the expert William A. Heilman to testify over objection that certain paint particles found in the tips of the fingers of the pair of gloves, and the samples from the hammer, originated from the same source as the samples taken from the safe; and also that the soap samples taken from the safe and from the fingers of the gloves had the same color, odor, and composition as the bar of Fels Naphtha soap found in the brief case.

It is noted that on cross-examination, this witness again stated

that the paint on the gloves and the hammer originated from the safe, and that he had no doubt that the soap from the safe and gloves was Fels Naphtha.

In examining Mr. Heilman's testimony, it appears that in the main he testified to scientific facts, based upon tests made by him, and his inferences were based on his technical knowledge of the subject, and were not based upon speculation or conjecture.

SDC 1960 Supp. 36.0117 provides as follows: "(1) An expert witness may be asked to state his inferences, whether these inferences are based on the witness' personal observation, or on evidence introduced at the trial and seen or heard by the witness, or on his technical knowledge of the subject, without first specifying hypothetically in the question the data on which these inferences are based. (2) An expert witness may be required, on direct or cross-examination, to specify the data on which his inferences are based." From a review of the testimony of both of the expert witnesses it appears the inferences stated by them were properly admissible and within the limitations of the above statutory rule. As stated in the case of Peters v. Hoisington, 72 S.D. 542, 37 N.W.2d 410, "The judge conducting a jury trial has broad discretionary powers and control over the presentation of evidence. The rule recognizes this and the action of the court is reviewable only for abuse of discretion."

When appellant was apprehended, a bottle of Benzedrine tablets was found under the front seat of the car he was driving, which was admitted in evidence over objection, and Mr. Heilman was allowed to testify that Benzedrine is a stimulating drug. Appellant contends that this was prejudicial. We agree that the admission of this evidence was erroneous and did not tend to prove or disprove any of the issues in this case; however, in view of the whole record, it is our opinion that the admission of such evidence was not of a prejudicial nature and did not affect the substantial rights of the appellant.

Appellant's final contention is that the evidence is insufficient to sustain the verdict, and calls attention to the fact that the only evidence in the record is circumstantial, and that there is

no direct evidence that the appellant committed the offense for which he was charged and convicted.

The established rule in this state is that to warrant a conviction upon circumstantial evidence alone, such facts and circumstances must be shown as are consistent with each other and with the guilt of the party charged, and such as can not by any reasonable theory be true and the party charged be innocent. State v. Schelske, 64 S.D. 574, 269 N.W. 81; State v. Rasch, 70 S.D. 517, 19 N.W.2d 339. However, the last phrase of this ruling does not mean that the evidence must be such as to exclude every possible hypothesis of innocence; rather, it requires only the exclusion of reasonable hypothesis of innocence. State v. Thomas, 78 S.D. 568, 105 N.W.2d 549.

After careful examination of every assignment of error and of the entire record, including the transcript of evidence, we are satisfied that, under this record, the jury could reasonably find that the defendant was guilty of burglary in the second degree, and that the rulings complained of are not shown to have been prejudicial to appellant's substantial legal rights. The order and judgment of the trial court are therefore affirmed.

All the Judges concur.

LUND, Circuit Judge, sitting for SMITH, J.