STATE of North Dakota ex rel. Allen I. OLSON, Attorney General of the State of North Dakota, Petitioner,

v.

Ralph B. MAXWELL, Judge of the District Court, First Judicial District, State of North Dakota, Respondent.

Cr. No. 613.

Supreme Court of North Dakota.

Nov. 4, 1977.

Edwin F. Zuern, Sp. Asst. Atty. Gen., and Calvin N. Rolfson, Deputy Atty. Gen., Bismarck, for petitioner State of North Dakota on behalf of relator Allen I. Olson.

Ralph B. Maxwell, Fargo, pro se.

VOGEL, Justice.

The Attorney General of North Dakota, on behalf of the Director of Institutions, who has as one of his responsibilities the administration of the State Penitentiary, has petitioned us to issue a supervisory writ directed to the Honorable Ralph B. Maxwell, district judge, requiring him to delete certain words from a judgment sentencing Cora Kroeplin to the State Penitentiary. The sentence provides that the defendant

". . . be imprisoned in the North Dakota State Penitentiary at Bismarck, . . . and at no other place, for the term of eighteen (18) months . . . ." [Emphasis in original.]

The complained-of words are those underlined. The briefs and arguments broaden the issue to include the question of the authority of the Director of Institutions to transfer prisoners, especially female prisoners, out of the State. We hold, on the record before us, that Cora Kroeplin must not be imprisoned outside the State of North Dakota unless and until a due-process hearing has been held or waived and an order entered permitting the transfer.

Our jurisdiction is based upon our authority to grant original writs as permitted by Section 86, North Dakota Constitution. The Attorney General bases his petition upon Sections 27–02–04, 27–02–05, and 27–02–05.1, also setting forth certain powers of this court.

We directed an order to Judge Maxwell to show cause why the writ requested by the Attorney General should not issue.

In his return, and in a personal appearance and argument before us, Judge Maxwell asserts that for several years all female prisoners sentenced to the State Penitentiary have been sent out of the State by the Director of Institutions, while male prisoners have been confined at the State Penitentiary within the State; that this practice, based solely upon sex, is a discriminatory and unequal treatment of women prisoners; and that it discriminates (1) by making it more difficult for them to gain access to the courts of this State, (2) by making it more difficult and costly for them to consult with lawyers in prosecuting appeals and other remedies, (3) by making it more difficult to apply and qualify for parole and to appear before the Parole Board in person, (4) by making it more difficult to have visits from, and preserve relationships with, family, relatives, and friends, and (5) by making it more difficult to attend to personal, business, and legal affairs.

The Attorney General asserts to us that women prisoners sentenced to the North

Dakota State Penitentiary are, and have been for six years, transferred to prisons for women in other States, formerly Nebraska and presently Minnesota. He says that the North Dakota State Penitentiary has "inadequate staff and facilities . . . to house and properly care for female prisoners"; that the policy of making such transfers "is supported by Section 54–21–25 of the North Dakota Century Code which allows the Director of Institutions to contract with the federal government and other state jurisdictions for correctional services"; that the Legislative Assembly provided funds for such transfers; and that compliance with the sentence imposed by Judge Maxwell would place the female prisoner (apparently because she would be the only woman, or one of the few women, in the Penitentiary) in "confining-protective custody permanently, without the ability to engage in adequate recreation, work, and other treatment programs" and might constitute cruel and unusual punishment.

The Attorney General further asserts that Judge Maxwell exceeded his authority by invading the discretion of the Director of Institutions, who, the Attorney General says, has the authority "to transfer prisoners under his authority and control as may be in their best interest."

I

■ We start with a consideration of the normal sentencing procedure in this State. Contrary to the assertion of the Director of Institutions, we conclude that the statutes of this State contemplate that the sentencing judge shall determine initially the place of confinement. Section 12.1–32–02, N.D. C.C., the primary statute relating to sentencing, provides for a sentence to:

"c. A term of imprisonment, . . .

"(1) In the penitentiary or a regional detention facility approved by the director of institutions, or in the state farm in accordance with sec-

tion 12–51–07, if convicted of a felony";

or

"g. Commitment to an appropriate licensed public or private institution for treatment of alcoholism, drug addiction, or mental disease or defect";

or

"h. Commitment to any other facility or program deemed appropriate for the treatment of the individual offender, including available community-based programs."

Provision also is made that the court shall give credit for time served prior to sentencing, and provision is made that the court may suspend all or part of any sentence.

It is evident that the fixing of the place of imprisonment is within the discretion of the trial court, in the first instance, and not that of the Director of Institutions. Cases cited by the Attorney General for the contrary position are based upon totally different statutory schemes. In all of them, the statutes provide for sentences to the custody of a State official, who has the authority to assign the prisoner to a specific institution, just as the Federal statute provides for a sentence to the custody of the Attorney General. 18 U.S.C. 4082.

The cases relied upon by the Attorney General are: *State ex rel. Sonner v. Shearin,* 272 Md. 502, 325 A.2d 573 (1974); *State v. Miner,* 113 Ariz. 56, 546 P.2d 342 (1976); *Re Prisoners Awaiting Transfer,* 236 Ga. 516, 224 S.E.2d 905 (1976). The statutes providing for sentencing to the custody of an individual official or board (rather than to a particular institution) are, respectively, *Sonner* : Md.Ann.Code, 1957 (1971 Repl. Vol., 1973 Cum. Supp.), Art. 27, Sec. 690; *Miner* : A.R.S. Sec. 13, 671(D); *Re Prisoners Awaiting Transfer* : Ga.Code Ann. Sec. 77, 309(d).

It is the court, in North Dakota, which specifies in the first instance the place of confinement of convicted persons sentenced to imprisonment.[1]

___

1. The Attorney General suggests that the reference in Section 12.1–32–02, N.D.C.C., to possible sentencing to confinement in a "regional detention facility approved by the director of

Our statutory scheme also contemplates that women, as well as men, are to be confined in the State Penitentiary. See Section 12–47–22, N.D.C.C., forbidding communication between the sexes within the institution.

## II

There are several statutes of this State which permit changes in the place of confinement once the serving of a sentence has begun.[2]

It will be noted that none of the statutes summarized in footnote 2 are applicable to the present factual situation, and it should be particularly noted that all of them contain quite explicit legislative direction as to when, where, and how they are to be applied.

institutions" allows the Director of Institutions to transfer prisoners in his discretion to such institutions as the women's prison at Shakopee, Minnesota. There are several defects in this argument. First, as we have pointed out, Section 12.1–32–02 contemplates a sentence to a particular institution by the court, not the Director of Institutions. Second, the term "regional detention facility" is nowhere defined or otherwise identified. Is it a place within the State of North Dakota, or without? We cannot tell. Third, the statute is subject to the same defects as to delegation of powers as is Section 54–21–25. See Part II, *infra*.

2. These include Section 12–51–09, permitting the Director of Institutions, after determining "that for purposes of safety of other inmates or of the general public or for the purpose of discipline it is necessary or proper that any person committed to the state farm should be transferred to the state penitentiary," to make such transfer. Similar provisions in the same statute allow transfers from the State Farm to the Penitentiary when a person committed to the State Farm "conducts himself in such manner as to interfere with the operation of the farm, or with the welfare or safety of others," and transfers from the Penitentiary to the Farm, "when such action seems desirable and for the best interests of the person so transferred and in no manner detrimental to the welfare of other persons who have been committed to said farm."

Section 12–47–27 provides that when the warden of the Penitentiary "believes that a person confined in the penitentiary has become mentally ill during his confinement, he may

In rather stark contrast to the foregoing statutes, Section 54–21–25, upon which the Attorney General relies primarily for authority to transfer Cora Kroeplin to the State of Minnesota, reads:

"If the director of institutions determines that suitable state facilities or services are not available for inmates under his control he may contract for same with the proper authorities of the United States, another state, another agency in this state or a political subdivision of this state. The director may also contract, without cost to the state, to provide services or facilities for persons held by any of the jurisdictions mentioned in this section."

## III

This case presents the constitutional issues of procedural due process and equal protection of the laws.

require such person to be given a psychiatric evaluation or transfer such person to the state hospital for such evaluation. If it is found from the evaluation that such person is mentally ill, such person shall be confined and treated in the state hospital upon a written order by the warden."

Section 12–44–29 provides that persons sentenced to county jails may be confined in the jails of adjoining counties, or a jail operated by the United States or any of its departments or agencies when an agreement or contract exists between the county commissioners and the appropriate officers of an agency of the United States operating such jail, "When there is no jail in a county or when the jail is not sufficient, . . ."

Section 12–47–35 provides that persons confined in the State Penitentiary who are "found to be in need of special treatment, care, custody, or training which cannot be provided for at the state penitentiary," may, if the Governor has contracted with the Attorney General or other proper official of the United States, pursuant to Federal law, be transferred to a Federal institution in order that such inmate "may receive the required special treatment, care, custody, or training." Such transfers are to be made only after the warden has submitted a request for the transfer to the State Board of Pardons, and the Board of Pardons has approved the request, after which the Governor has petitioned the Attorney General or other proper official of the United States asking that the transfer be made.

■ We first consider whether the prisoner's right to procedural due process is being denied. The extent to which procedural due process must be afforded depends upon the circumstances of each case and the nature of the loss involved. *Havener v. Glaser*, 251 N.W.2d 753 (N.D.1977).

■ Courts have employed basically a two-tiered test in determining the constitutional validity of particular classifications. Under the traditional equal-protection analysis, classifications are sustained if they are rationally related to a conceivable, legitimate, governmental objective. *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). A more stringent standard of review is applied where the classification is termed "inherently suspect" or where the classification impinges on fundamental rights. Included within the "inherently suspect" category are classifications based upon such criteria as race, sex, illegitimacy, and immutable characteristics determined solely by accident of birth. In such cases strict judicial scrutiny is called for, and classifications will be held invalid unless it is shown that the statute promotes a compelling governmental interest and that the distinctions drawn by the law are necessary to further its purpose. See *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). We have recognized the suspect category [*In re G. H.*, 218 N.W.2d 441 (N.D.1974)], and used it in analyzing the North Dakota constitutional provision on equal protection, Section 20. We have also indicated that classifications based on sex are "inherently suspect" under our State Constitution. *Tang v. Ping*, 209 N.W.2d 624 (N.D.1973). See *Bingert v. Bingert*, 247 N.W.2d 464 (N.D.1976). See also *Hastings v. James River Aerie No. 2337, Etc.*, 246 N.W.2d 747 (N.D.1976); *Arp v. Workers' Compensation Appeal Board*, 19 Cal.3d 395, 138 Cal.Rptr. 293, 563 P.2d 849 (1977).

## IV

■ Under both Federal and State constitutional provisions for equal protection and procedural due process,[3] we are satisfied that the present-day rule is that prisoners confined in one State under the laws of that State may not be constitutionally transferred to another State, except in emergency situations, without minimum procedural due process.

It once was the law that a felon was considered civilly dead,[4] and that by committing a crime he "not only forfeited his liberty, but all his personal rights except those which the law in its humanity accords to him. He is for the time being the slave of the State." *Ruffin v. Commonwealth*, 62 Va. (21 Gratt.) 790, 796 (1871). No longer. In recent years, while recognizing that the primary responsibility for the execution of sentences of imprisonment lies with the prison administrator and the executive branch of government, the courts have come to the position that even imprisoned felons have certain minimum rights (often less complete than the rights of persons not imprisoned), including freedom of religion, freedom from racial segregation, freedom of speech and association to some degree, the right of access to the courts, the right to reasonable medical care, and freedom from cruel and unusual punishment. Note, "Procedural Due Process in the Involuntary Transfer of Prisoners," 60 Va.L.Rev. 333 (1974); Note, "Procedural Due Process in Prisoners' Rights: The State Giveth and the State Taketh Away," 57 B.U.L.Rev. 387 (March, 1977); *Carpenter v. State of South Dakota*, 536 F.2d 759 (8th Cir. 1976); *Havener v. Glaser, supra; Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *compare, Miller v. Turner*, 64 N.D. 463, 253 N.W. 437 (1934).

In recent years, the courts have recognized that prisoners have a right to mini-

---

3. Constitution of North Dakota, Secs. 13 and 20; United States Constitution, Amendments V and XIV.

4. Even in this State, until 1973, when Section 12–06–27 was repealed by adoption of the North Dakota Criminal Code, Title 12.1, N.D.

C.C. (Chap. 116, 1973 S. L.), effective July 1, 1975. But the civilly dead prisoner retained some "natural" rights and the right to convey property. See Sec. 12–06–27 and *Miller v. Turner*, 64 N.D. 463, 253 N.W. 437 (1934).

mum procedural due process. The right to hearings, often more limited than full trials, has been recognized where prison officials seek to impose punishment for violation of rules and regulations [*Wolff v. McDonnell, supra*]; where parole-revocation proceedings are instituted [*Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)]; and where probation-revocation proceedings are instituted [*Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), and *McGuire v. Warden of State Farm, Etc.,* 229 N.W.2d 211 (N.D.1975)].

Courts in recent years have frequently been faced with the questions now before us: whether transfers between penal institutions are administrative and discretionary with the prison administration, or whether they are subject to regulation by the courts to determine whether constitutional rights of inmates have been violated. These questions have arisen in a variety of contexts. Sometimes the transfer is between institutions in the same State, and sometimes the transfer is interstate, as here. Sometimes the transfers are for disciplinary reasons, and sometimes they are not.

Most often, it has been held that intrastate transfers (at least the nondisciplinary ones) are administrative in nature and procedural due-process hearings are not required, primarily because the prison authority has the right to confine a convicted defendant in any one of several institutions, and the prisoner has no vested right to be confined in any particular one. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Gomes v. Travisono,* 353 F.Supp. 457 (D.R.I.1973); *State v. Orricer,* 80 S.D. 126, 120 N.W.2d 528 (1963); *Park v. Thompson,* 356 F.Supp. 783 (D.Hawaii 1973), and cases cited at Note 19. Of course, by the same reasoning, changes in confinement conditions within the same institution do not ordinarily raise constitutional questions. *Havener v. Glaser, supra.*

Interstate transfers, however, call into play different considerations. As in North Dakota, as we have shown above, the statutory scheme in other States almost invariably contemplates confinement within the State. Something more than mere administrative convenience is required to justify a transfer outside the State, and the right of a prisoner to be confined within the State in which he is convicted will be presumed. See *Park v. Thompson, supra; Capitan v. Cupp,* 356 F.Supp. 302 (D.Or. 1972); and, especially, *Gomes v. Travisono,* 510 F.2d 537 (1st Cir. 1974), modifying, after remand by the United States Supreme Court [418 U.S. 908, 94 S.Ct. 3200, 41 L.Ed.2d 1155 (1974)], *Gomes v. Travisono,* 490 F.2d 1209 (1st Cir. 1973). *Contra, Fajeriak v. McGinnis,* 493 F.2d 468 (9th Cir. 1974); *but see Lokey v. Richardson,* 527 F.2d 949, at 952–953 (9th Cir. 1975), which indicates that the views of the Ninth Circuit are now in a state of flux.

The requirement of a due-process hearing applies to administrative transfers, which may be intended for the convenience of the administration or for the benefit of the prisoner, as well as to disciplinary transfers, particularly if the transfer involves a "grievous loss" to the prisoner.[5] See *Gomes v. Travisono, supra,* 510 F.2d at 539 and 541; *Park v. Thompson, supra; Capitan v. Cupp, supra.*

The extent of, and procedure in, the due-process hearing will necessarily vary according to circumstances. As suggested in *Gomes v. Travisono, supra,* 510 F.2d at 541, the proof in a transfer involving movement from an overcrowded prison in one State to a less-crowded prison in another, since it would provide benefits for both the State and the prisoner, might extend only to the detrimental effects on the prisoner and whether they amount to an unconstitutional deprivation, while transfers based on disciplinary reasons would require a broader hearing with opportunity to challenge the

---

**5.** The term "grievous loss" comes from the Frankfurter dissent in *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951), quoted in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and has frequently been used since, to denote those disadvantages which are serious enough to affect the prisoners' constitutional rights.

allegations of misconduct as well as consideration of the effects of the contemplated transfer on the individual and the institution.

## V

We have examined Section 54–21–25, N.D.C.C., quoted above in Part II, which is the statute upon which the Director of Institutions relies in asserting authority to transfer women and some other prisoners outside the State, and we are satisfied that it lacks the procedural due-process standards which both Federal and State Constitutions require. It gives unlimited authority to the Director of Institutions to determine the suitability of State facilities or services and the availability or unavailability of such facilities or services, and it gives him unlimited and unrestricted authority to contract with other States and the United States for unspecified facilities and services, all without any opportunity for notice, hearing, or opportunity for the prisoner to object. It is also so lacking in standards and guidelines as to constitute an apparent authority to the Director of Institutions to legislate, which is another way of saying that it is an unconstitutional delegation of powers. See *Nord v. Guy,* 141 N.W.2d 395 (N.D.1966); *Anderson v. Pederson,* 78 N.D. 949, 54 N.W.2d 542 (1952).

As applied to the case of Cora Kroeplin, we were advised at oral argument that no hearing had been held nor was contemplated, nor were hearings held as to other female prisoners transported outside the State in the past. Female prisoners have not been allowed to have anything to say about their transfers to other States.

We therefore hold that Section 54–21–25, N.D.C.C., as written and as applied to female prisoners transferred to other States, is unconstitutional as violative of procedural due process and as an impermissible delegation to the Director of Institutions of legislative power.

■■■ Since the concurrence of four members of this court is required to declare a statute unconstitutional [Const. of N.D., Sec. 88], and only three members of the court concur in this opinion, Section 54–21–25, is not declared unconstitutional by a sufficient majority. However, under our supervisory powers, the majority of the court has the power to order compliance with due-process requirements regardless of the constitutionality or unconstitutionality of the statute, and we so order.[6]

■■■ Furthermore, we hold that the public interest in the continuing controversy involved in this case is such as to require us to decide it, under our power over the courts, rather than refuse to do so and let the controversy continue.

## VI

Further comment on some of the authorities cited by the Attorney General may be appropriate. He relies, to a large extent,

---

6. We believe a few further remarks are required in response to the dissenting opinion.

The dissenting opinion argues that only Cora Kroeplin may attack the constitutionality of her sentence, citing such cases as *State v. Gamble-Skogmo, Inc.,* 144 N.W.2d 749 (N.D. 1966). This is the general rule, but the dissent concedes that the rule is subject to the exception that constitutional questions may be raised by others if "weighty countervailing policies" are present.

This is not an ordinary appeal from a decision of a lower court. It is a case invoking our original jurisdiction [Const. of N.D., Sec. 86], and asking us to exercise our supervisory power over a district court [Sec. 27–02–05.1, N.D.C.C.]. In such cases we have the right and the duty to decide whether the matter is one of "great public interest" [*State ex rel. Dakota Trust Co. v. Stutsman,* 24 N.D. 68, 139 N.W. 83 (1912)], "of public concern in which the state and each of its citizens have a vital interest" [*State ex rel. Shafer v. Lowe,* 54 N.D. 637, 210 N.W. 501 (1926)], whether the case presents "questions of great public interest [which] involve the authority and power of public officials and the real merits of the controversy are still unsettled" [*Kirchmeier v. Hjelle,* 129 N.W.2d 373 (N.D.1964)], or whether there are "weighty countervailing policies" to justify an exception to the general rule [*State v. Gamble-Skogmo, Inc., supra*]. In *Hart v. Bye,* 86 N.W.2d 635 (N.D.1957), "public interest" is defined to mean "something in which the public, the community at large, has some pecuniary interest, or some interest by which their legal rights or liabilities are affected."

upon *Meachum v. Fano, supra,* as holding that a prisoner has no right to be confined in any one prison. But *Meachum* makes clear that it is concerned only with intrastate transfers, and holds that a State may confine a convicted defendant in "any of its prisons." It is based upon Massachusetts law, which created no right to be confined in any one prison, unlike North Dakota, the statutes of which contemplate confinement in the prison specified in the sentence, with certain exceptions which we have summarized in Part I of this opinion. As we have indicated above, the relevant case law makes a rather sharp distinction between the rights of a prisoner as to intrastate transfers, as in *Meachum,* as opposed to interstate transfers, as in the present case.[7]

The Attorney General makes much, and properly so, of the right of the constituted prison authorities to make appropriate decisions as to the treatment of inmates in their charge. We recognize these considerations, and have no desire or intention to regulate the internal operations of the prison system. But, as we have specified above, it is our duty to recognize the civil rights of prisoners as well as all other citizens and residents of this State, and we believe this can be done without interfering with the legitimate authority of the prison officials. We note, in passing, that our decision is consistent with the Manual of Standards for Adult Correctional Institutions [see especially No. 4377], prepared by the Commission on Accreditation for Corrections[8] and sponsored by the American Correctional Association, and with Standards 2.8 and 2.13 of the Report on Corrections (1977), one of the six reports of the National Advisory Commission on Criminal Justice Standards and Goals. These standards provide for notice to the offender when his status is being reviewed, for participation of the offender in decisions affecting his program, and for compliance with procedural due-process requirements.

The one court decision probably most helpful to the position of the Attorney General is *Rebideau v. Stoneman,* 398 F.Supp. 805 (D.Vt.1975), involving a transfer from Vermont prisons to Federal prisons under a statute specifically authorizing such transfers after a maximum-security prison had been closed under legislative authority, leaving no maximum-security facilities in Vermont. Aside from the obvious factual differences, we note that a statute similar to our Section 12–47–35, summarized in footnote 2, was there under challenge. Such statutes provide standards and guidelines for the exercise of discretion, and therefore are less subject to being overturned as unconstitutional than is Section 54–21–25, which we have held above lacks such standards. Further, the *Rebideau* case involves transfers specifically authorized by legislative Act. 28 V.S.A. § 706(b) (1975).

## VII

 Of course, if there were no adverse effects to the prisoner from the transfer to another State, amounting to "grievous loss" or affecting the "liberty interests" of the prisoner, there would be no constitutional deprivation and no violation of constitutional rights. However, some deprivations are inherent in such transfers. In *Gomes v. Travisono, supra,* 490 F.2d 1209, modified in 510 F.2d 537, it was held that inability to attend parole board hearings was a deprivation, and so was inability to meet in person with attorneys, whether court-appointed or otherwise. And see *Tai v. Thompson,* 396 F.Supp. 196, 200 (D.Hawaii 1975), for minimum requirements as to notice and hearing whenever there are "overtones of disciplinary action or of deprivation of liberty or equality of treatment in an out-of-state transfer of a state prisoner, . . . ." We are advised that male prisoners at the North Dakota State Penitentiary routinely appear before the Parole Board at

---

**7.** We emphasize, however, that *Meachum* holds that the Federal Constitution does not require a due-process hearing on intrastate transfers. The State Constitution may require

such hearings, a point we do not decide, as it is not before us.

**8.** North Dakota's Chief Parole Officer, Irvin Riedman, was a member of the Commission.

least once a year unless they specifically refuse to appear, while female prisoners confined outside the State do not appear in person before the Parole Board. Instead, the Chief Parole Officer travels to the other State and interviews the female prisoner, tape-records the conversation, and presents the tape-recording to the Parole Board at its next meeting. We hold that this is not the equivalent of a personal appearance before the Parole Board. A tape-recorded interview with a parole officer deprives the prisoner of the opportunity to make a personal impression upon the Parole Board, to ask questions, and to make complaints to persons who are unattached to the penal system except as members of the Parole Board. We do not hold that annual personal appearances before the Parole Board are a constitutional or statutory right. We do hold that such appearances must be allowed to all persons sentenced to imprisonment in the Penitentiary on the same terms, if allowed to any.

Similarly, although the additional distance in the case of Cora Kroeplin is not great, since Shakopee, Minnesota, where the women's prison is located, is perhaps 50 miles farther from Buffalo, North Dakota,[9] her home at the time of the offense, than Bismarck, North Dakota, where the State Penitentiary is located, in almost all other cases the mileage differences would be more extreme. The greater the difference in mileage, the less likelihood there is of visits from family and friends, the less opportunity for personal meetings with the attorney for the prisoner, and the greater the isolation involved in confinement. These, too, are substantial detriments or "grievous loss." *Tai v. Thompson, supra; Mitchell v. Untreiner,* 421 F.Supp. 886 (D.Fla.1976).

Lack of contact with friends and family, inability to consult with attorneys, and adverse effect upon parole opportunities were all considered to be substantial deprivations or "grievous loss," raising constitutional issues, in *Gomes v. Travisono, supra; Park v. Thompson, supra; Tai v. Thompson, supra;* and *Mitchell v. Untreiner, supra.* We agree.

It is true, as the Attorney General asserts, that *Rebideau v. Stoneman, supra,* makes the statement that impairment of visits or difficulty of access to counsel are not constitutional barriers, but we are unpersuaded by that statement or by the cases cited to support it. The only case cited directly is *Gomes v. Travisono, supra.* We find no support for that position in the two appellate *Gomes* decisions. On the contrary, they hold that some due process is required in all transfer cases (490 F.2d at 1214 and 510 F.2d at 541).

## VIII

We come now to the contention of Judge Maxwell that interstate transfers of women, as such, are unconstitutional as based on the "inherently suspect" classification by gender and unsupported by any justification which will pass the "strict judicial scrutiny" required of such classifications, and the assertion of the Attorney General that such transfers of women are justified because the women cannot be confined in the State Penitentiary because it is impossible or difficult to provide adequate treatment and rehabilitation services to them there, and that keeping them there would be cruel and unusual punishment.

■ We hold, based on the case law cited in Part III above, that classification by sex is an inherently suspect classification, requiring strict judicial scrutiny to determine whether it is required by a compelling State interest. *Shapiro v. Thompson, supra.*

■ The assertion by the Attorney General that the State does not have funds available to provide for women prisoners within the State of North Dakota does not

**9.** The transcript of sentencing indicates that Mrs. Kroeplin was employed, at the time of sentencing, as a "housekeeper on a farm in the northern part of the State." If so, the differ-

ence in distance between her home and Shakopee would be much more than the 50 additional miles to Bismarck.

constitute a compelling State interest necessary to justify discriminatory treatment based upon a suspect classification.

"Lack of funds is not an acceptable excuse for unconstitutional conditions of incarceration." *Finney v. Arkansas Board of Correction*, 505 F.2d 194, 201 (8th Cir. 1974).

"Shortage of funds is not a justification for continuing to deny citizens their constitutional rights." *Gates v. Collier*, 501 F.2d 1291, 1320 (5th Cir. 1974).

"More significantly, however, it is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson v. City of Memphis, Tenn.*, 373 U.S. 526, 537, 83 S.Ct. 1314, 1321, 10 L.Ed.2d 529, 538 (1963).

When we eliminate the justifications based upon lack of funds, as we must, according to the case law applicable to constitutional deprivations based upon suspect criteria including sex, we find no remaining justification for the transfer of women prisoners to other States.

We now are faced with this situation:

1. Women may not be transferred from the Penitentiary for reasons relating only to their sex and administrative convenience or lack of facilities and personnel without at least a due-process hearing at which they may participate;

2. The prison authorities insist that they have no adequate facilities and personnel to take care of women prisoners, due to lack of funds; and

3. The alternative course they suggest is to send women outside the State for reasons based only on their sex and administrative convenience or lack of facilities and personnel.

We were faced with a similar circular argument and counsel of despair in *Kitto v. Minot Park District*, 224 N.W.2d 795 (N.D. 1974), and resolved the problem by using to so-called "prospective overruling" or "Sunburst" approach. We will do likewise here.

As we said in *Kitto, supra*, 224 N.W.2d at 804,

"Consistent with what has been termed the *Sunburst* Doctrine,[19] state courts

[19] "*Sunburst Oil & Refining Co. v. Great Northern Ry. Co.*, 91 Mont. 216, 7 P.2d 927 (1932); *Great Northern Ry. Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932)."

have, in recent cases, recognized and utilized prospective application of decisions as a means of avoiding injustice in cases of this type. Decisions have been applied prospectively to be effective as to causes of action arising at varying future dates. The particular rule of law may or may not be applied to the parties to the appeal. This approach provides the judicial branch with some much needed flexibility in dealing with questions having widespread ramifications for persons not parties to the action."

We have applied the *Sunburst* Doctrine selectively, sometimes to future cases only, excluding the case before us [*Walker v. Omdahl*, 242 N.W.2d 649 (N.D.1976)], and sometimes to future cases as well as the case then before us [*Kitto v. Minot Park District, supra*, and *Johnson v. Hassett*, 217 N.W.2d 771 (N.D.1974)]. In the present instance, we draw the line at a point between, and apply the rule in part to this case.

We hold that Cora Kroeplin must be initially confined in the State Penitentiary. If the administration of that institution confesses that it cannot, with means at its disposal (which may include application to the Emergency Commission for funds), provide for her and other women prisoners facilities equal, though not necessarily identical, to those provided for male prisoners, it may then hold a hearing, of which she shall have notice, with opportunity to prepare, and at which she may appear with counsel and present evidence, and after which hearing findings shall be made. If such findings justify an emergency transfer to an out-of-State facility upon a balancing of her interests and those of the State, a temporary transfer may be made. However, such temporary arrangements may extend only to such time as the next Legis-

lative Assembly has met, and, if construction of a penal facility in North Dakota for women prisoners has been authorized and funds appropriated, such additional time as is reasonably required for construction and for obtaining of competent personnel.

## IX

In view of what we have said above, inclusion of the words "and at no other place" serves no useful purpose, and those five words are stricken from the sentence. At the hearing, Judge Maxwell acknowledged that he had not intended to restrict the prison administrators from moving prisoners from the Penitentiary for purposes of hospitalization or treatment or work release or educational release or to the State Hospital pursuant to Section 12–47–27, N.D.C.C. Judge Maxwell agreed to a suggestion of substitution of language to the effect that the sentence be served "at no other place outside the State of North Dakota, . . ." In view of our requirement of due-process hearings prior to such transfers during an interim period, we believe that such language is not required.

Except as specified above, the petition for a supervisory writ is denied.

ERICKSTAD, C. J., and PEDERSON, J., concur.

SAND, Justice (concurring in part and dissenting in part).

I concur with the philosophical concepts on constitutional rights and privileges expressed in Justice Vogel's opinion pertaining to transfer of women prisoners to out-of-state institutions based solely upon the sex of the prisoner. I would fully agree with the opinion if the constitutional question were properly before us.

However, I do not agree with the inference that the constitutional question was properly raised or is ripe for our determination as a result of the petition for a supervisory writ challenging the district judge's right to insert the language, "and in no other place," in the sentence of Cora Kroeplin.

The record of the trial court, as represented to us by the Attorney General, does not contain anything which could be considered as giving rise to a belief that the judge's authority was being questioned as to his right to designate the place of imprisonment under § 12.1–32–02, North Dakota Century Code. Neither has any factual basis been presented which would give the district judge sufficient legal interest to challenge the constitutionality of this section or § 54–21–25, NDCC.

If anyone has the right to challenge § 54–21–25, NDCC, it is Cora Kroeplin. She also has the right, privilege, and prerogative to decide whether or not she wishes to challenge.

The principle of law that only those who have a direct interest in or are affected by a statute may challenge its constitutionality has been firmly established.

We have held that a litigant may assert only his own constitutional rights unless he can present weighty countervailing policies. *State v. Woodworth,* 234 N.W.2d 243 (N.D. 1975); *United States v. Raines,* 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed. 524 (1929); *State v. Gamble Skogmo, Inc.,* 144 N.W.2d 749 (N.D. 1966). Therefore, legal logic dictates that if a litigant may assert only his own constitutional right, then a non-litigant, which would include the trial judge, would not have the right to challenge the statute (§ 54–21–25, NDCC). The mere fact that the trial judge heard the case and was in a position to impose sentence does not give him the right to challenge the constitutionality of the Act.

This Court has also held that a person may question the constitutionality of a statute only when and insofar as it is sought to be applied to his disadvantage and the one attacking the constitutionality is not a champion of any rights except his own. *Asbury Hospital v. Cass County,* 72 N.D. 359, 7 N.W.2d 438 (1943). For other cases stating the same principle of law see 4 Dakota Digest, Constitutional Law

We have also held that the question of constitutionality will only be entertained by this Court if it was raised in the lower court or adequately preserved. In this instance the record in the lower court, as represented to us, does not give the slightest hint that the constitutionality of § 54–21–25, NDCC, was even suspected of being questionable.

In this case the constitutional question surfaced in the return to the petition for a supervisory writ.

The United States Supreme Court, in *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 92 S.Ct. 1716, 32 L.Ed.2d 317 (1972), said:

"It is axiomatic that the federal courts do not decide abstract questions posed by parties who lack 'a personal stake in the outcome of the controversy.' *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, [677] (1962); *Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947, [962] (1968)."

The Court, in denying the constitutional challenge, observed that the parties did not allege any particulars that made the requirement (which was being challenged) other than a hypothetical burden. This concept and principle applies equally well to the present case. There is nothing in the record which indicates that the district judge's authority was in any way impaired, impinged or frustrated. His right to sentence under § 12.1–32–02, NDCC, had not been impaired. I am unable to find any authority for the Judge's insertion of the words "and in no other place."

Cora Kroeplin, the defendant in the criminal action, has been used as a mere pawn (without her consent) to reach a constitutional question which she has not raised even though she is the party affected.

Volume 16, C.J.S. *Constitutional Law* § 96, page 332, states:

"A court should proceed with reluctance to set aside legislation as unconstitutional on grounds not properly presented. Accordingly, the invalidity of a statute, in order to be relied on, must ordinarily be specifically raised by the pleadings.

"This is not an inflexible rule, however, and in some instances constitutional questions inherently involved in the determination of the cause may be considered even though they may not have been raised as required by orderly procedure."

The cases listed under "Not an inflexible" do not come close to the situation in this case.

The principle stated in the first sentence has been so firmly established that there is no need to recite the numerous cases which gave rise to this concept.

In 16 Am.Jur.2d, *Constitutional Law* § 119, page 310, the principle of the law is again stated:

"The constitutionality of a legislative act is open to attack only by a person whose rights are affected thereby. Before a law can be assailed by any person on the ground that it is unconstitutional, he must show that he has an interest in the question in that the enforcement of the law would be an infringement on his rights."

The same authority continues:

"The corollary to the general rule is that one who is not prejudiced by the enforcement of an act of the legislature cannot question its constitutionality."

Section 121 of the same states:

"To meet the test of interest requisite to challenging the constitutionality of legislation, the person seeking to make the challenge must show that he is directly affected by the legislation in question."

The same authority, in § 122, states:

"No one can obtain a decision as to the invalidity of a law on the ground that it impairs the rights of others, nor may one excepted from the operation of a law attack it, for one attacking the constitutionality of a statute is not the champion of any rights except his own."

The same authority, with reference to public officers, in § 128, states that:

"Under the general principle that the constitutionality of a statute cannot be questioned by one whose rights are not affected thereby and who has no interest

in defeating it, the question has arisen as to whether a public officer has such interest as would entitle him to question the constitutionality of a statute and to refuse to comply with its provisions. It has generally been answered in the negative."

Ostensibly, the Judge used the sentencing provision by adding the phrase "and in no other place" to challenge the constitutionality of § 54–21–25, NDCC, on the basis that he has taken an oath to uphold the constitution. (This was his representation at oral argument.) If the right to challenge the constitutionality of an Act depends on whether or not the officer has taken an oath to support the constitution, we would have an endless list of officials who may challenge the constitutionality of an Act. I would also suggest that the courts will be preoccupied with self-styled constitutional questions if this were the rule of law. Even if it were to apply only to the judiciary, I can visualize the judges of district courts, judges of the county courts with increased jurisdiction, judges of the county courts, judges of the county justice courts and judges of the municipal courts challenging various statutory provisions as being unconstitutional as it may apply to some of their functions, not as litigants but as administrators of the provisions of the law.

Under this concept, a judicial officer may, sua sponte, make a decision so as to deliberately raise a constitutional question as it may relate to the actions that may be taken by another administrative body. I think this would be improper. If this were permitted this Court would then be devising one set of rules to be followed by judicial officers and one set of rules to be followed by all other persons and officers even if the particular right does not affect the functions of the judicial officer. In this instance, the provisions of § 54–21–25 do not interfere with the judicial functions of the trial court.

Finally, the question of the validity of § 54–21–25, NDCC, can be adequately raised by Cora Kroeplin, who would have a direct interest in the outcome and who would have the prerogative of determining whether or not she even wishes to challenge the constitutionality. It may well be that Cora Kroeplin would prefer serving her sentence elsewhere than in the North Dakota Penitentiary.

This Court has had several occasions in which it held that the judge loses jurisdiction upon sentencing a defendant to the State Penitentiary. *John v. State*, 160 N.W.2d 37 (N.D.1968). The same conclusion was reached in *State v. Gronlie* and *State v. Heck*, 213 N.W.2d 874 (N.D.1973). This supports the proposition that the judge after sentencing to the State Penitentiary has lost jurisdiction, except under Rule 35, North Dakota Rules of Criminal Procedure. The language, "and in no other place," seems to be a deliberate effort to bypass the decisions of this Court in the foregoing cases so as to retain some jurisdiction.

The only and basic question presented in the petition for a supervisory writ is whether or not the trial court had authority to include in the sentencing judgment the underscored words, "be imprisoned in the North Dakota State Penitentiary . . . and at no other place . . ." The constitutional question was raised only by the trial judge in defense of his action.

The trial judge did not point to any law which gave him the authority to insert those words.

Public interest, upon which the majority opinion seems to rely, has not been a ground upon which a constitutional question has been considered.

Public interest has been a factor in determining whether or not the Supreme Court should or should not exercise its original jurisdiction, but public interest does not and has not heretofore constituted grounds to entertain a constitutional question either before this Court or the United States Supreme Court.

But as I said in the beginning, with reference to the legal concept of rights and privileges, I concur in the philosophical expressions in the opinion of Justice Vogel,

but I would not have reached the constitutional question.

PAULSON, J., concurs.