James C. KELLEY, Petitioner
and Appellant,

v.

Tom POWERS, Warden of the North
Dakota State Penitentiary,
Respondent and Appellee.

Civ. No. 910026.

Supreme Court of North Dakota.

Nov. 18, 1991.

Gregory Ian Runge (argued), Bismarck, for petitioner and appellant.

William G. Peterson (argued), Asst. Atty. Gen., Bismarck, for respondent and appellee.

MESCHKE, Justice.

James Clark Kelley appeals from a district court order denying his certiorari request for an institutional hearing on his interstate transfer from the North Dakota penitentiary to Ely State Prison in Nevada. We affirm.

In April 1989, Kelley was convicted of murder in North Dakota and sentenced to life imprisonment. *See State v. Kelley*, 450 N.W.2d 729 (N.D.1990). Thereafter, he was taken to Nevada where he plead guilty to first degree murder and robbery, and was there sentenced to two additional and consecutive life sentences. Because the Nevada sentences were consecutive to the North Dakota sentence, Kelley was returned to North Dakota to serve that sentence first.

Upon his return to the North Dakota penitentiary in February 1990, Kelley was placed in administrative segregation, separate from the general prison population. His isolation was based on recommendations from the Nevada Department of Corrections that Kelley was a dangerous and violent inmate. Threats by Kelley toward another North Dakota penitentiary inmate, Nikki Stoner, an accomplice who had testified against him in his North Dakota murder trial, were additional reasons for his isolation. In March, Kelley was returned to the general prison population after signing a behavioral agreement to refrain from threatening Stoner.

In April 1990, prison staff learned that Kelley had violated his behavioral contract by again threatening to kill Stoner, and also that he was planning to take hostages for an escape attempt. The prison staff believed that Kelley was a serious security risk because he had killed five people. Reports of threats on Kelley's life concerned prison staff for his personal safety, too. For these reasons, Kelley was again placed in administrative segregation. By May 1990, prison officials became convinced that Kelley needed a more secure prison. During their search for one, Warden Tom Powers and Chief of Security Stephen Scott often spoke to Kelley about their intentions to transfer him to another prison outside North Dakota. In those conversations, Kelley's only request was that he not be transferred to Kentucky where other murder charges were still pending against him.

Finally, on August 21, 1990, Kelley was brought to the warden's office to meet with Warden Powers, Chief of Security Scott, Deputy Warden Bob Coad, Program Director Mark Molesworth, and Orientation Unit Manager Charlie Schumacher. Kelley was told that he was going to be transferred to Nevada for safety and security reasons. Kelley voiced no objections and said, "Okay." Kelley asked to see his attorney before leaving, but that request was denied "after conferring with transport company, for security reasons."

Later, after an abortive attempt at an administrative appeal, Kelley petitioned for a writ of certiorari in district court seeking his return to North Dakota because he had been transferred "without benefit of due process." The trial court denied the writ, ruling that no hearing was necessary because "the transfer here occurred after the petitioner consented to it and ... the petitioner was aware that he had the right not to consent." Kelley appeals.

On appeal from a denial of a writ of certiorari we review whether the official has regularly pursued the authority of his office. NDCC 32–33–09; *State v. Morrissey*, 295 N.W.2d 307, 310 (N.D.1980). In this case, we confine our review to whether the warden, as the designated representative of the director of institutions, exceeded his authority in transferring Kelley to an out-of-state penitentiary.

■ Kelley first contends that he was deprived of a constitutionally protected liberty interest without a hearing before this out-of-state transfer. Kelley argues that this court's decision in *State ex rel. Olson v. Maxwell,* 259 N.W.2d 621 (N.D.1977), mandates a full due process hearing before any interstate transfer of a prisoner.

In *Maxwell,* the trial judge sentenced an adult female to imprisonment in the North Dakota penitentiary, and directed that her imprisonment be "at no other place." *Id.* at 624. The Attorney General sought a supervisory writ requiring the judge to delete the direction "at no other place" because the North Dakota penitentiary lacked adequate staff and facilities "to house and properly care for female prisoners" and had been transferring them to suitable prisons elsewhere for a number of years. *Id.* at 624–25. The *Maxwell* majority barred the female prisoner's transfer out of state without a hearing.

Based largely on then current federal precedents, 259 N.W.2d at 628, the *Maxwell* majority concluded that "prisoners confined in one State under the laws of that State may not be constitutionally transferred to another State, except in emergency situations, without minimum procedural due process." *Maxwell,* 259 N.W.2d at 627. It is this statement in *Maxwell,* Kelley insists, that established "a liberty interest" and "presumptive right 'to be confined within the State in which he is convicted.'" Much has taken place since *Maxwell* was decided, including a statutory change in North Dakota and a United States Supreme Court clarification of the constitutional status of interstate transfers of prisoners.

Following *Maxwell,* NDCC 54–21–25 was amended to conform to its tenor. 1979 ND Laws Ch. 546. As amended, NDCC 54–21–25 conditionally authorized the out-of-state transfer of a prisoner when a suitable facility was not available within this state. The relevant part of NDCC 54–21–25 authorized review of the transfer "by an institutional staff board" but only when the inmate "does not consent to the transfer."[1] In this case, the trial court found that "[t]hough it was not accomplished artfully, ... the transfer here occurred after [Kelley] consented to it...."

Kelley argues that his statutory rights require specific notice of his constitutional right to object to the transfer and of his constitutional right to a hearing on the transfer. Kelley misinterprets both the statute and his due process rights.

■ The Due Process Clause does not mandate a hearing for transfer of a prisoner. *Meachum v. Fano,* 427 U.S. 215, 229, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976)

---

1. NDCC 54–21–25 then said:

*Authority to contract with other governmental agencies for prisoners and juvenile delinquents.* If the director of institutions determines that suitable state facilities or services are not available for adult inmates or juvenile delinquents under his control he may contract for same with the proper authorities of the United States, Canada, and any of its governmental subdivisions, another state, another agency in this state or a political subdivision of this state, or with any private or public correctional or treatment facility or agency. The director may also contract, without cost to the state, to provide services or facilities for persons held by any of the jurisdictions mentioned in this section. An adult inmate or juvenile delinquent who is considered for transfer to another jurisdiction as herein provided, and who as an adult or as parent or guardian of a juvenile does not consent to the transfer, will be given notice of the pending transfer and a review by an institutional staff board including at least one member from the treatment staff, the security or housing staff, the administrative staff, and chaired by an individual designated by the director of institutions to determine the need and justification for a transfer. The findings of the review board will, if appropriate, be given to the adult inmate or juvenile delinquent or a representative or guardian, and in the case of adults, to the pardon board, and in the case of juveniles, to the designated juvenile court staff for their approval of the requested transfer. If a treaty between the United States and a foreign country for the transfer and exchange of offenders, the director of institutions, upon recommendation of the warden and the approval of the governor, may on behalf of the state under the terms of the treaty transfer or exchange offenders and take any action necessary for the state to participate in the treaty.

This section has since been repealed. 1991 ND Laws Ch. 595, section 3. This former section is now partially embodied in NDCC 54–23.3–04. *See* 1991 ND Laws Ch. 595, section 2.

(Reversing a holding that, under the Due Process Clause, Massachusetts prisoners were entitled to notice and hearing before intrastate transfer to maximum-security institutions in the same state). *See also Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). Generally, prisoners have diminished constitutional protections during incarceration, although they may not be deprived of life or property without due process of law. *Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974). In this context, due process is not an end in itself; its purpose is to protect a "substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona*, 461 U.S. 238, 250, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983) (The Due Process Clause does not restrict the interstate transfer of a prisoner).

■ Although a prisoner has no constitutional right to a hearing before a prison transfer, a state may create such a right. *Olim*. Once created, this right is "sufficiently embraced within Fourteenth Amendment 'liberty' " to entitle a prisoner to minimum procedures ensuring that this right is not arbitrarily abrogated. *Wolff*, 418 U.S. at 557, 94 S.Ct. at 2975. In North Dakota, this statutorily created right exists only when the prisoner does not consent to the transfer. Having consented, Kelley had neither a statutory nor a constitutional right to a hearing.

"Just as an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State, he has no justifiable expectation that he will be incarcerated in any particular State." *Olim*, 461 U.S. at 245, 103 S.Ct. at 1745. Nor does a prisoner have the right to expect incarceration in only one institution for an entire prison term. "[I]t is neither unreasonable nor unusual for an inmate to serve practically his entire sentence in a State other than the one in which he was convicted and sentenced, or to be transferred to an out-of-state prison after serving a portion of his sentence in his home State." *Id.* at 247, 103 S.Ct. at 1746. Kelley's consent to the transfer resulted in his relin-

quishing any right to a hearing, and his consent satisfied the state-created liberty interest embodied in the statute.

■ Kelley also argues that he was denied due process because his request to confer with his attorney was denied. Generally, the right to assistance of counsel exists during those "critical stages" of a criminal proceeding where "the accused require[s] aid in coping with legal problems or assistance in meeting his adversary." *United States v. Ash*, 413 U.S. 300, 313, 93 S.Ct. 2568, 2575, 37 L.Ed.2d 619 (1973). Post-conviction interstate transfer of a prisoner by prison administrators is not a "critical stage" for assistance of counsel.

■ This record tells us that, for safety reasons, prisoners are often moved in the middle of the night. Kelley was moved during the day so that he could meet with the warden and other prison staff. Upon his consent, the private transfer company, hired to take Kelley to Nevada, moved him immediately. In this, Warden Powers followed accepted prison security and administrative procedures. Requiring the presence of an inmate's counsel for this sort of prison administrative action would give the action an unnecessarily adversary cast, cause undesirable delay, and frustrate correctional goals. *Wolff*, 418 U.S. at 570, 94 S.Ct. at 2981. We conclude that Kelley was not denied due process because his request to confer with his attorney at the time of transfer was denied.

Keeping Kelley incarcerated was a complex administrative matter, requiring heightened security and vigilance. Kelley was frequently advised of the warden's intentions to transfer him to a more secure prison and had ample opportunity to object. Had Kelley failed to consent to the transfer, the warden was prepared to conduct the statutorily-mandated review of the transfer decision by the institutional staff board. The designated staff members were present with Kelley in the warden's office for that purpose when Kelley consented to the transfer.

■ It was suggested by the district court, and we agree, that a contemporane-

**590**

ous record of the transfer proceedings would protect both the prison and the prisoner against a collateral proceeding, like this one, arising from a misunderstanding of the process. *See Wolff* at 565, 94 S.Ct. at 2979. Warden Powers agreed that it would be possible to tape record the proceedings. A signed transfer consent would clearly evidence a consent, too. In this case, the warden recorded Kelley's consent in a contemporaneous written report about the August 21, 1990 meeting with Kelley. This contemporaneous record satisfactorily evidences compliance with NDCC 54–21–25 in this case. We hold, therefore, that the warden did not exceed his authority in transferring Kelley to Ely State Prison in Nevada.

■ Kelley questions the validity of his consent. Kelley argues that he was not specifically informed that he could object to the transfer, or that his objections would prompt an institutional review. Thus, he argues, his consent was not "knowing." The trial court found that Kelley "was aware that he had the right not to consent." The evidence supports that finding and we affirm it.

We affirm denial of the writ of certiorari.

VANDE WALLE, Acting C.J., LEVINE and GIERKE, JJ., and JAHNKE, District Judge, concur.

JAHNKE, District Judge, sitting in place of ERICKSTAD, C.J., disqualified.